Hon. David Noriega Rodríguez, demandante y recurrido, *v.* Hon. Rafael Hernández Colón, Gobernador de Puerto Rico, y otros, demandados y peticionarios; Graciani Miranda Marchand, demandante y recurrido, *v.* Carlos López Feliciano y otros, demandados y peticionarios; Instituto Puertorriqueño de Derechos Civiles, demandante, *v.* Negociado de Investigaciones Especiales y otros, demandados.

*Número:* CE-89-578 *Resuelto:* 30 de junio de 1992

920

*Jorge Pérez Díaz, Procurador General,* y *Anabelle Rodríguez, Procuradora General Auxiliar,* abogados de los peticionarios; *Juan Nazario de la Rosa, Juan Santiago Nieves, Víctor García San Inocencio* y *Luis Rivera Lacourt,* abogados de David Noriega Rodríguez; *Orlando Martínez Sotomayor,* abogado de Graciany Miranda Marchand; *Roberto Roldán Burgos* y *Adalina de Jesús,* abogados del Instituto de Derechos Civiles de Puerto Rico; *Nora Rodríguez Matías* y *Luis F. Abreu Elías,* abogados del Colegio de Abogados de Puerto Rico; *Richard Markus,* abogado de la Asociación de Miembros de la Policía; *José A. Candelario Lajara* y *Luis Cabrera Medina,* abogados de la Federación Puertorriqueña y Cuerpo Organizado de la Policía; *Ángel M. Martir* y *Abraham Díaz González,* Comisionados Judiciales.

El Juez Asociado Señor Negrón García emitió la opinión del Tribunal.

"[U]na gran parte de la actividad legal es rutinaria —las premisas son indiscutidas, y la declaración lógica es todo lo que se necesita como guía— *los problemas surgen cuando se rompe la rutina. La insuficiencia de la rutina significa que las premisas son difíciles de hallar; las reglas parecen estar en conflicto o son difíciles de comprender y de aplicar; los hechos no pueden describirse fácilmente como ejemplos de reglas, etcétera.*" (Énfasis suplido.) C. Morris, *Cómo Razonan los Abogados,* México, Ed. Limusa Wiley, 1960, pág. 174.

Este pensamiento describe lo complejo de este zigzagueante proceso judicial: una rutina investigativa, gubernamental y pervertida *que por décadas causó en el país un eclipse constitucional,* devaluó valores comunitarios y produjo una madeja jurídica que estamos obligados a desenredar para la tranquilidad espiritual de la presente generación y las futuras. El Estado, aprovechando —más que las diferencias legítimas ciudadanas— las aprehensiones, los temores, la ignorancia, la intolerancia e incluso la histeria en determinados momentos, elevó a categoría oficial la práctica de fichar y mantener listas y expedientes de quie-

nes profesaban la ideología independentista, como si ello fuera un delito. Por ende, el remedio judicial no puede ser parcial ni tampoco inconcluso; como afirma Couture, todo proceso "solo se explica por su fin, el proceso por el proceso no existe".

Apreciar este recurso en sus perspectivas jurídico-constitucional, histórica, social y política requiere —a modo de brevísimo repaso— exponer los principios elementales pertinentes que sirven de ancla a nuestro sistema de vida constitucional. Su característica primordial, quintaesencia de gobierno democrático, es la libertad de pensamiento y expresión. Bajo cualquiera de las teorías principales que se aducen en abono del derecho a la libre expresión,([1]) en todo asunto, estamos en libertad de diferir frente a los gobernantes y demás personas. Nadie ni nada está inmune a la discusión. "Si nos cercioramos de su profundo significado sabremos ver en la palabra 'Democracia' el gran espacio que deja abierto a la posibilidad de conflictos ideológicos." C.J. Friedrich, *La democracia como forma política y como forma de vida*, Madrid, Ed. Tecnos S.A., 1961, pág. 108. Por tal razón, es menester distinguir entre el Estado, el Gobierno de turno y el partido en el poder; ninguno puede reclamar eterna permanencia.

La democracia es una forma de vida, en la cual —a modo de experimento diario— se pone a prueba toda la

---

([1]) "Tal vez la teoría más influyente, comúnmente asociada con la prédica de Holmes sobre 'libre intercambio de ideas' en el 'mercado de competencia', pudiera llamarse la teoría del 'conocimiento' o 'mercado'. Esta teoría postula que el libre intercambio de ideas es indispensable para adelantar el conocimiento y lograr la verdad. Otra teoría prominente, que llamaremos la 'teoría democrática', mantiene que el libre fluir de información es una condición esencial para una ciudadanía informada y necesaria para un gobierno propio. Una teoría propuesta, que pudiéramos llamar la 'teoría de la autorrealización', enfatiza la relación entre la libre expresión y la autorrealización o autodeterminación del individuo." (Escolios omitidos y traducción nuestra.) S.D. Smith, *Skepticism, Tolerance, and Truth in the Theory of Free Expression*, 60 S. Cal. L. Rev. 651, 655–656 (1987).

La más reciente teoría es la denominada *teoría de tolerancia a la libre expresión*, promovida por el mismo Smith y el Prof. L.C. Bollinger en su artículo *Free Speech and Intellectual Values*, 92 Yale L.J. 438 (1983).

gama de ideas, opiniones, conclusiones y demás percepciones que el ser humano genera en una sociedad pluralista. En la zona intelectual y afectiva, el individuo se presenta empapado de conflictos y diferencias con un juicio crítico a veces sano, elevado y constructivo y, en ocasiones, producto de la mala fe, el fanatismo, la intolerancia, la ignorancia, el prejuicio, etc. Basta reflexionar nuestras experiencias cotidianas —interfamiliares, con los vecinos, e incluso aquellos a quienes no conocemos directamente— para darnos cuenta del cúmulo de sentimientos y actitudes positivas y negativas involucradas. "[S]i todos los hombres fuesen amigos, la justicia sería innecesaria, pues se haría por amor, y como amor, lo que ésta exige y más de lo que exige. Pero tal hipótesis es inviable, porque las enemistades y el desamor son también ineliminables de la vida del hombre." L. Legay y Lacambra, *El Derecho y el Amor*, Barcelona, Ed. Bosch, 1976, pág. 95.

No importa la teoría que endosemos —modelo del libre mercado de ideas, modelo del proceso democrático, modelo de libertad o modelo de tolerancia— promover el desarrollo saludable en una sociedad democrática implica aceptar, como inevitable, el derecho de toda persona —familiares, amigos, vecinos, compañeros de trabajo y desconocidos— de toda tendencia ideológica (independentista, autonomista, estadista, comunista, anarquista, socialista, etc.), a manifestar un criterio distinto y antagónico del nuestro, a tener de nosotros una buena o mala opinión, a criticarnos ideológicamente, a percibir distorsionada o perniciosamente nuestro comportamiento y nuestras creencias, en fin, a juzgarnos severa o intolerantemente, alejados del mandamiento puro de amar al prójimo. Nuestras opiniones y las de ese prójimo, sean o no prejuiciadas, no pueden ser objeto de control gubernamental. Ello atentaría contra la naturaleza humana y sofocaría el libre pensamiento y la expresión.

## II

Se recordará que en *Noriega v. Gobernador*, 122 D.P.R. 650 (1988), confirmamos las sentencias del Tribunal Superior, Sala de San Juan (Hon. Arnaldo López Rodríguez, Juez) de 31 de julio y 14 de septiembre de 1987, que declararon inconstitucional la práctica de preparar, actualizar y preservar expedientes, carpetas, listas, ficheros, etc., de personas, agrupaciones y organizaciones, única y exclusivamente por creencias o tendencias políticas e ideológicas. Por la naturaleza y extensión tripartita del agravio a derechos fundamentales, "libertad de palabra, de asociación y de intimidad, y por constituir una afrenta a la dignidad del ser humano" (íd., pág. 655), la razón de decidir —incluso en las opiniones concurrentes— indicaba que estábamos ante una actividad inconstitucional per se.[2]

Allí ratificamos la entrega de dichos documentos a las personas y entidades afectadas, mediante unas reglas diseñadas por el ilustrado foro de instancia, las cuales originalmente permitían excluir, de los expedientes que se entregarían, los nombres de agentes y las fuentes de información. Valga aclarar que desde el primer momento dicho foro reconoció que esa información no estaba realmente protegida por los privilegios de las Reglas 31 y 32 de Evidencia, 32 L.P.R.A. Ap. IV, ni por nuestra doctrina jurisprudencial. No obstante esa salvedad, movido por un espíritu de justicia en pro de la protección de la vida de

---

[2] La práctica inconstitucional mereció —a través de la pluma del Juez Asociado Señor Ortiz— nuestro repudio unánime por ser "antidemocrática"; una "afrenta a la dignidad del ser humano" —*Noriega v. Gobernador*, 122 D.P.R. 650, 655 (1988)— "odiosa" y "desafortunada". La opinión de conformidad del Juez Asociado Señor Negrón García la caracterizó como "un capítulo en el que el país se subdesarrolló constitucionalmente" —íd., pág. 694— y permitió "criminalizar el ideario político de la independencia y convirtió la útil facultad investigativa de la policía —como función legítima disuasiva del delito— en disuasiva de la libertad". Expresó, además, que "pocas veces en la historia de este Foro nos hemos confrontado con una situación que amerita tan enérgica y resuelta adjudicación remedial". Íd., pág. 700. El Juez Asociado Señor Hernández Denton, al censurarla, la estimó "nociva a la vida comunitaria y democrática de nuestro país ...". Íd., pág. 701.

esas personas, y bajo el razonamiento de que ellas se limitaron a seguir instrucciones de sus superiores, a la postre sostuvo en la Regla 6.1 para hacer viable la entrega de expedientes abiertos ilegalmente por la División de Inteligencia de la Policía de Puerto Rico (en adelante Reglas para la Entrega de Expedientes)(³) que la información debía eliminarse. En nuestra decisión sobre ese remedio y otros, dijimos que no había razón para intervenir y que "toca, en primera instancia, al Poder Ejecutivo cumplir con los detalles de notificación, entrega y disposición final .... Además, será función del tribunal adjudicar los reclamos de confidencialidad que puedan levantarse por el Estado". *Noriega v. Gobernador*, supra, pág. 690.

Devuelto el *mandato*, el 9 de enero de 1989 comenzó el esperado proceso conducente a la entrega de expedientes. Las labores se concentraron en el Negociado de Investiga-

---

(³) Dispone:

"El Estado ha informado a este Tribunal que se propone radicar un gran número de peticiones reclamando confidencialidad sobre hechos y datos que constan en los expedientes abiertos ilegalmente por la División de Inteligencia de la Policía de Puerto Rico y cuya entrega a las personas concernidas se ha decretado en este pleito.

"La mayor parte de estas solicitudes girarán en torno a que se suprima de los mismos la identidad de los agentes encubiertos involucrados en la investigación de las personas y entidades sujeto del,expediente, así como la identidad de terceras personas.

"*Con el propósito de evitar esa anunciada avalancha de peticiones de reclamos de confidencialidad, las que tendrían el efecto de retrasar la entrega de información a la persona sujeto del expediente y congestionar innecesariamente el calendario de este Tribunal, consideramos prudente en esta etapa de los procedimientos que el Tribunal fije su posición con relación a los méritos de tales solicitudes.*

"Si bien es cierto que dicha información *no es la información oficial que contempla el privilegio que establece la Regla 31 y 32 de las de Evidencia y la Jurisprudencia* no es menos cierto que permitir la divulgación de los nombres de esas personas podría poner en peligros la vida y seguridad de las mismas.

"No consideramos *justo ni razonable* poner en peligro la vida y seguridad de los agentes, así como la de las fuentes de información, por cuanto estas personas se limitaban a seguir instrucciones de sus superiores. El Estado ha confesado su culpabilidad por esta nefasta práctica declarada inconstitucional y la persona que resulte lesionada como consecuencia de la misma, en su día le podrá reclamar al Estado resarcimiento por los daños y perjuicios sufridos.

"Por lo anteriormente indicado y en vista de ese interés legítimo del Estado, *se dispone que el Estado podrá excluir con tinta ideleble de los documentos única y exclusivamente los nombres de los agentes involucrados y los nombres de las personas de las fuentes de información.*" (Énfasis suplido y escolio omitido.) Caso Núm. CE-89-578, Parte I, *Exhibit* III, págs. 89–91.

ciones Criminales (N.I.C.) del Departamento de Justicia. No transcurrió mucho tiempo cuando afloraron las complicaciones. El 2 de febrero de 1989 el Estado reclamó confidencialidad ante el Panel de Comisionados designado por el Tribunal Superior en torno a tres (3) privilegios básicos de información, a saber: la identidad de agentes encubiertos, confidentes, informantes y fuentes de información; la identidad de terceras personas cuyos nombres figuraban en los expedientes; y sobre las técnicas de investigación.

El 16 de febrero de 1989 el Instituto Puertorriqueño de Derechos Civiles replicó. Reconoció que las expresiones del tribunal en cuanto a la protección de los nombres de agentes o fuentes de información constituían la *ley del caso*, pero se opuso a su expansión por no haber "necesidad de proteger la vida de un agente fallecido". CE-89-578, Parte I, *Exhibit* V, pág. 125. Además, argumentó la distinción existente "entre agentes que *seguían órdenes* y oficiales que *impartían órdenes*". (Énfasis suplido y en el original.) Íd.

El 27 de febrero de 1989, el demandante Noriega Rodríguez también se opuso. Reconoció condicionalmente que la no divulgación de los nombres de agentes, confidentes e informantes fue asunto debidamente adjudicado en las sentencias en favor del Estado y se sometió a la *ley del caso*. No obstante, aclaró y argumentó contra la petición del Estado. Adelantó la tesis de que esos privilegios tenían que interpretarse restrictivamente por tratarse de agentes e informantes que participaron en una actividad inconstitucional y, además, que la eliminación de sus nombres de los expedientes que se entregarían "podría constituir para los afectados la eliminación y amputación de causas de acciones al amparo de la Ley de Derechos Civiles Federal —42 U.S.C. 1983 y ss.— en los foros federales contra tales funcionarios públicos". Caso Núm. CE-89-578, Parte I, *Exhibit* VI, pág. 153. Sin ambages, el demandante Noriega Rodríguez ob-

jetó las pretensiones del Estado en cuanto a terceros y las técnicas de investigación.

Subsiguientemente, el 8 de mayo de 1989 el Estado presentó un memorando supletorio y reiteró sus argumentos. Simultáneamente, invocó un número sustancial de situaciones privilegiadas en torno al expediente del demandante Miranda Marchand. El 23 de junio de 1989, los Comisionados presentaron su evaluación. Concluyeron que la Regla 6.1 para la Entrega de Expedientes (eliminación de nombres de agentes encubiertos e informantes): (1) se extendía a la no divulgación de los números, claves o códigos utilizados en los documentos que han de ser entregados y que pudieron conducir a descubrir sus identidades; (2) era improcedente la solicitud de excluir información que revelara la identidad de terceros, y (3) favorecieron la confidencialidad de las técnicas de investigación.

Así las cosas, se efectuó una inspección ocular del material y del lugar de almacenamiento en el Cuartel General de la Policía. Esta inspección introdujo una dimensión hasta ese momento insospechada: en contraste con la del N.I.C., *reveló dramáticamente lo voluminoso del material y de la información allí existente, y lo monumental de la tarea.*

El 30 de junio de 1987 el tribunal de instancia celebró una vista. El Estado argumentó su teoría y renunció al reclamo de confidencialidad sobre las técnicas investigativas. Los demandantes Noriega Rodríguez y el Instituto Puertorriqueño de Derechos Civiles solicitaron la reconsideración del privilegio de identidad de los agentes y confidentes.

El 16 de agosto de 1989, en un elaborado y persuasivo dictamen, el tribunal de instancia resolvió que no procedía ningún reclamo de confidencialidad. Se basó en que las actuaciones ilegales del Estado no estaban cobijadas por ninguno de los privilegios evidenciarios. La información en cuestión era vital para hacer valer cualquier remedio

futuro. El compromiso de garantizar la vindicación de los derechos civiles y constitucionales de las víctimas y perjudicados se tornaría académico por el tiempo que transcurriría atender y disponer los reclamos de confidencialidad. Ordenó la entrega de los expedientes quince (15) días después, esto es, a partir de 1ro de septiembre de 1989.

Inconformes, a solicitud del Estado paralizamos y acordamos revisar. Como parte del trámite, se elevó una muestra de veinte (20) expedientes para ser examinados en cámara. Concedimos términos a las partes para memoriales sobre puntos específicos, autorizamos la comparecencia como *amici curiae* del Colegio de Abogados, Asociación de la Policía y Federación de la Policía, y, además, el 15 de marzo de 1990 celebramos una extensa vista oral. Con el beneficio de los alegatos de las partes, incluso un último escrito que solicitaba la desestimación del recurso presentado por el Honorable Noriega Rodríguez fechado el 16 de marzo de 1992 y la réplica del Estado, resolvemos.

## III

En su primer señalamiento de error, el Estado reitera la necesidad de excluir toda información que pudiese conducir a revelar la identidad de agentes encubiertos, confidentes, informantes y demás fuentes de información.

Invoca la doctrina de la *ley del caso*.[4] Aduce que desde la sentencia original de 31 de julio de 1987, el tribunal de instancia determinó que los reclamos de confidencialidad debían atenderse en virtud de los privilegios establecidos en las Reglas 31 y 32 de Evidencia, *supra*, y la normativa jurisprudencial pautada en *Soto v. Srio. de Justicia*, 112

---

[4] Incorporada en nuestra jurisdicción, en *Calzada et al. v. De La Cruz et al.*, 18 D.P.R. 491, 494 (1912), se dijo: "Es un principio de ley bien establecido que las proposiciones y cuestiones discutidas, consideradas y resueltas en la primera apelación constituyen la ley del caso y no deben ni pueden ser discutidas en la segunda apelación."

D.P.R. 477 (1982); *Santiago v. Bobb y El Mundo, Inc.*, 117 D.P.R. 153 (1986); *López Vives v. Policía de P.R.*, 118 D.P.R. 219 (1987). En esa ocasión dicho foro estimó que "revelar el nombre de todas estas personas o agrupaciones que han sido calificad[a]s indebidamente por la Policía de Puerto Rico como 'subversivos', puede causar daños irreparables a algunas de esas personas" (Caso Núm. CE-89-578, Parte I, *Exhibit* II, pág. 65); preocupación que plasmó en su sentencia posterior de 14 de septiembre en la Regla 6.1, *supra*. Como confirmamos íntegramente esas reglas —y los demandantes nunca las cuestionaron— el Estado argumenta que el mandato generado por la doctrina de la *ley del caso* impedía la reconsideración. No tiene razón.

■ Se trata de una doctrina al servicio de la justicia, no la injusticia; no es férrea ni de aplicación absoluta. Por el contrario, es descartable si conduce a resultados "manifiestamente injustos". *Estado v. Ocean Park Development Corp.*, 79 D.P.R. 158, 174 (1956). Véanse: *Srio. del Trabajo v. Tribunal Superior*, 95 D.P.R. 136, 140 (1967); *Rivera v. Insurance Co. of P.R.*, 103 D.P.R. 91, 94 (1974). Las "determinaciones de un tribunal apelativo constituyen la ley del caso en todas aquellas cuestiones consideradas y decididas y que dichas determinaciones generalmente obligan tanto al tribunal de instancia como al que las dictó si el caso vuelve a su consideración. *También se reconoce que si el Tribunal entiende que la ley del caso antes establecida es errónea y que puede causar una grave injusticia, el Tribunal puede aplicar una norma de derecho diferente a fin de resolver en forma justa*". (Énfasis en el original suprimido y énfasis suplido.) *Don Quixote Hotel v. Tribunal Superior*, 100 D.P.R. 19, 29–30 (1971).

Antes expusimos que nuestra decisión respetó la discreción del tribunal de instancia y el mandato fue sin menoscabo de que "adjudicar[a] los reclamos de confidencialidad que *pu[dieran]* levantarse por el Estado". (Énfasis suplido.)

*Noriega v. Gobernador*, supra, pág. 690. Esa frase respondió a la situación procesal existente; implícitamente dejó abiertas las puertas para la reformulación de las reglas. No representó una camisa de fuerza judicial.

■ Desde sus inicios reconocimos que estábamos ante un caso constitucional e históricamente único, de singulares remedios, cuya trayectoria requería el más ponderado análisis judicial sobre la marcha. Fuimos conscientes que adjudicábamos "el alcance del *injunction* permanente emitido para poner en vigor una sentencia declaratoria consentida por el Estado". *Noriega v. Gobernador*, supra, pág. 681. No podía ser de otro modo. El *injunction* es, por naturaleza, dinámico: "se caracteriza por su perentoriedad, por su acción dirigida a evitar un daño inminente o a restablecer el régimen de ley conculcado por conducta opresiva, ilegal o violenta del transgresor del orden jurídico." *Peña v. Federación de Esgrima de P.R.*, 108 D.P.R. 147, 154 (1978).

■ Anotamos ahora, que si bien el Estado opone en su favor la atadura de la *ley del caso*, paradójicamente se la niega a los reclamantes. No podemos refrendar esa doble vara. Sobre el remedio diseñado dijimos que "[m]entes razonables, objetivas e imparciales podrán discrepar de algunas de ellas. De ser así y el tribunal de instancia quedar convencido de que algunas de ellas ameritan *descartarse, modificarse o ampliarse, conserva la facultad de así hacerlo*. Ello es así ya que el *injunction* es un remedio dinámico sobre el cual los tribunales siempre conservan jurisdicción para dejarlo sin efecto o modificarlo a favor o en contra del que resulta obligado. Véanse, al respecto: *Peña v. Federación de Esgrima de P.R.*, ante; Ríos v. Municipio de San Sebastián, 106 D.P.R. 172 (1977)". (Énfasis suplido.) *Noriega v. Gobernador*, supra, pág. 688.

IV

Estos fundamentos nos permiten concluir que la *ley del caso, en esta controversia*, vislumbró la posibilidad de que el tribunal de instancia descartara, modificara o ampliara la Regla 6.1 para la Entrega de Expedientes. Por sus propios términos, nuestra decisión llevó ínsitamente *una ley del caso —inherente a éste—* flexible para aceptar los reajustes necesarios. Y es que, desde el primer momento, el propósito de la Regla 6.1, *supra*, fue hacer cumplida justicia, reivindicar derechos fundamentales, evitar una congestión innecesaria en el calendario judicial y no atrasar la entrega de los expedientes. Como en la etapa inicial de los procedimientos, dicha regla recogió la posición del tribunal de instancia respecto a la confidencialidad de los agentes y demás informantes, y subsiguientemente la descartó; nuestra función ahora es examinar qué lo motivó, si jurídicamente estuvo justificado y si hace justicia.

El ilustrado juez de instancia contesta así estas interrogantes:

> El reclamo de confidencialidad sobre los nombres de agentes e informantes que participaron en la confección de expedientes, tarjeteros, ficheros, etc., mediante información obtenida ilegal e inconstitucionalmente, fue adjudicado en las *Sentencias* a favor del Estado. *Si hubiéramos tenido entonces el beneficio del excelente memorando de derecho sometido luego por el demandante Noriega Rodríguez y de la vista ocular que hicimos al Cuartel General de la Policía y al Negociado de Investigaciones Especiales en la que comprobamos la magnitud de la labor que confrontaríamos en el examen de los expedientes, no hubiéramos excluido los nombres de los agentes involucrados ni de las personas fuentes de información contenidos en los expedientes de los ciudadanos perjudicados por la práctica ilegal del Estado.*
> Ahora tenemos la oportunidad de reconsiderar y así lo hacemos. (Énfasis suplido y en el original.) Caso Núm. CE-49-578, Parte I, *Exhibit* I, pág. 14.

A tal efecto, concluyó:

Nuestra reconsideración obedece a que la intervención de los agentes, agentes encubiertos, informantes y confidentes consuetudinarios fue ilegal e inconstitucional y la información obtenida por ellos fue, en el mayor de los casos, subrepticia y engañosamente obtenida con pleno conocimient[o] de su ilegalidad, según queda evidenciado por las advertencias recibidas de sus superiores contenidas en el document[o] titu[la]do *"Proceso Investigativo de la Oficina de Inteligencia"*,([5]) del cual hemos transcrito precedentemente la parte pertinente. *Dicho proceso investigativo delata un plan para violar deliberadamente los derechos constitucionales y para evadir la responsabilidad civil y criminal de todos aquellos que en diversas capacidades intervinieron en el proceso.* Las violaciones al orden constitucional fueron ilegales, deliberadas e inconmensurables.

La práctica ilegal e inconstitucional del [E]stado de fichar y perseguir la identidad de personas única y exclusivamente por razón de sus ideas políticas alcanza a toda nuestra sociedad. Fueron víctimas de esta ominosa actuación estudiantes, maestros, profesores universitarios, artistas, periodistas, ingenieros, abogados, fiscales, jueces del Tribunal de Justicia, líderes religiosos, artesanos, ejecutivos gubernamentales, etc. *Véase Informe de los Comisionados*, páginas 7 y 8, Anejo II. *No existe evidencia que demuestre que la vida de los agentes, agentes encubiertos e informantes corra peligro.* Los casos demuestran la naturaleza precaria de nuestra vida constitucional y la impu-

---

([5]) El documento aludido fue anejado por los Comisionados en su *informe* al Tribunal de 1ro de agosto de 1989.

En lo pertinente exponía:

"Cuando se nos asigna una investigación tenemos que hacer uso de nuestra habilidad para poder realizarla. *Tenemos que tomar en cuenta que a estas investigaciones no se aplican las técnicas de investigación criminal.*

"Nosotros tenemos que investigar de tal manera que las personas entrevistadas ni la persona investigada *se enteren de nuestra labor.* En otras palabras, las personas que se entrevisten no pueden saber a quién es que se investiga, por qué se investiga, qué es lo que se investiga, ni quién es el que investiga ([n]o pueden saber que usted es un agente de la Oficina de Inteligencia).

*"Si nosotros fallamos en esa labor nos exponemos a que radiquen una querella en contra nuestra por violación de derechos civiles y a ser procesados criminalmente.* Esto es así, ya que nuestras investigaciones giran en torno a individuos que *profesan ideales separatistas* y estos al saber que los estamos investigando alegan que los estamos persiguiendo y reprimiendo por sus ideales políticos *y como todos sabemos, esto está prohibido por nuestra [C]onstitución.*

"Para prevenir ese problema es necesario que adoptemos nuestro propio sistema de investigación, *valiéndonos de ciertas artimañas para hacer creer a las personas que entrevistamos que estamos investigando otros asuntos que no tienen nada que ver con subversión o afiliaciones políticas."* (Énfasis suplido.) Caso Núm. CE-89-578, Parte I, *Exhibit* I, págs. 39–40.

nidad del Estado, durante más de medio siglo para violar los derechos ciudadanos que viene obligado a proteger.

Acceder a las solicitudes de confidencialidad del Estado, privaría a los demandantes, en la realidad, del remedio que les concedió la *Sentencia*. Más aún, la *Sentencia* no sería ejecutable debido al procedimiento que requeriría tiempo y recursos infinitos. *Véase Informe de los Comisionados que se aneja a esta Resolución.* (Énfasis suplido y en el original.) Caso Núm. CE-89-578, Parte I, *Exhibit* I, págs. 17–20.

Vemos, pues, que el conocimiento adquirido posteriormente por el tribunal de instancia —en torno al carácter deliberado y conocimiento de la ilegalidad de la práctica, cómo ésta abarcó un sector sustancial de la sociedad y la ausencia de evidencia en que apoyar el peligro potencial a las vidas de los agentes, agentes encubiertos e informantes— fueron las razones que lo movieron a reconsiderar. "[N]uestros conocimientos son los gérmenes de nuestras creaciones." Buffon, citado por A.V. Fernández, *Función Creadora del Juez*, Buenos Aires, Ed. Abeledo-Perrot, 1970, pág. 89. Ello nos mueve a examinar los reclamos de confidencialidad del Estado. Concentremos en los méritos de sus argumentos principales.

Como dijéramos antes, el Estado opone las Reglas 31 y 32 de Evidencia, *supra*, y nuestros pronunciamientos en *Soto v. Srio. de Justicia*, supra; *Santiago v. Bobb y El Mundo, Inc.*, supra, y *López Vives v. Policía de P.R.*, supra. Resume así su contención:

[P]rimeramente se recalca el hecho de que toda vez que el reclamo de confidencialidad que aquí se discute versa sobre la identidad de agentes encubiertos, o confidentes o de personas privadas informantes (fuentes de información), o de cualquier tipo de información que lleve a revelar la identidad de éstos, debe recurrirse a la Regla 32 de Evidencia. Bajo ésta, si tal identidad no ha sido revelada previamente, *debe* prevalecer el reclamo de confidencialidad del Estado *salvo* que la revelación de la identidad sea "esencial para una justa decisión de la controversia". Debe tomarse en cuenta además, que el caso de

autos no trata de "la defensa del acusado" sino *exclusivamente* sobre la entrega de unos expedientes a las personas perjudicadas. Consiguientemente la revelación de tal identidad, "no es esencial para una justa decisión de la controversia". Adicionalmente, la jurisprudencia ha dejado demostrado que a los fines de no vulnerar el privilegio de informantes tampoco se puede dar a la publicidad información oficial alguna que conlleve la identificación del informante en cuestión. Finalmente, de lo antes mencionado se desprende, con meridiana claridad, que los fundamentos en que se basa el privilegio aquí invocado encarnan una importante política pública del Estado, la cual ha sido vulnerada por el tribunal de instancia al no reconocer los mismos y desatender el mandato expreso de la Regla 32. (Énfasis en el original.) Caso Núm. CE-89-578, Parte II, Escrito en cumplimiento de orden, pág. 11.

Fundado en ese análisis, reclama la expurgación de los nombres:

[De] todas aquellas personas que de una forma u otra proveyeron información, de cualquier tipo, a los agentes del orden público referente al sujeto de un expediente. Adviértase que cuando un agente llevaba a cabo una investigación éste muy bien podía acudir a los vecinos del sujeto investigado e inquirir sobre éste. Así también podía acudir al pueblo donde residía dicha persona y allí interrogar al alcalde, al médico del pueblo, a jueces, y a otras personas prominentes de dicha comunidad y solicitarles información relacionada con la persona investigada. *Estas personas al contestar las preguntas que se les hacía cumplían con su obligación ciudadana de cooperar con los agentes del orden público y no tenían razón alguna para sospechar que la investigación que se llevaba a cabo podía ser inválida.* La información recopilada era posteriormente vaciada en el expediente de la persona objeto de la investigación, identificándose el nombre de la persona que proveyó la información.

Por otro lado son *informantes o confidentes* todas aquellas personas que ofrecen información a las autoridades, quienes a su vez pudieron o no, haber sido partícipes en la actividad investigada. Bajo este renglón caen, entre otros, miembros de las organizaciones investigadas, quienes pudieron, en un momento dado, cooperar con el agente policiaco en la investigación en curso.

Finalmente, en lo que se refiere a agentes encubiertos, solo hay que destacar que el reclamo del Estado cobija a *todos aquellos que se desempeñaron como tal en el pasado; independiente-*

*mente que al día de hoy hallan fallecido o no se desempeñen en ese tipo de labor.* De más está decir que cubre también a aquellos que al presente continúan desempeñándose como agentes encubiertos infiltrándose en el crimen organizado, o realizando otras labores de seguridad pública para de esta forma combatir el crimen efectivamente. (Énfasis suplido.) Caso Núm. CE-89-578, Parte II, Escrito en cumplimiento de orden, págs. 6–7.

En resumen, el Estado nos pide que decretemos la eliminación total y no cualificada del nombre de cualquier agente, agente encubierto, confidente o informante, vivo o muerto, que aparezca en los cientos de miles de folios y demás documentos en cuestión.

■ No podemos acceder y cubrirnos así con el manto de confidencialidad propuesto. En *Soto v. Srio. de Justicia,* supra, pág. 485, destacamos "[e]l ideal de una verdadera democracia como desiderátum en que se inspira nuestra Constitución concibe la libertad de palabra, de prensa, de reunión pacífica y de pedir al gobierno *la reparación de agravios 'dentro de la más dilatada visión'* ". (Énfasis suplido y escolio omitido.) A tono con ese concepto, establecimos el derecho de la ciudadanía de acceso a información, como atributo lógico de " 'una sociedad que se gobierna a sí misma ... sujet[o] sólo a aquellas limitaciones que impone la más urgente necesidad pública. Debe elevarse ese derecho a una posición de la más alta santidad si ha de constituir un baluarte contra un liderato insensible' ". (Énfasis suprimido.) Íd.

■ La tendencia en favor del derecho a la información es irreversible. *López Vives v. Policía de P.R.,* supra, pág. 227. Si en algún caso se justifica es en éste. "[E]xiste una estrecha correspondencia entre el derecho a la libre expresión y la libertad de información. La premisa es sencilla. Sin conocimiento de hechos no se puede juzgar; tampoco se puede exigir remedios a los agravios gubernamentales mediante los procedimientos judiciales o a través del proceso de las urnas cada cuatro (4) años .... Nuestra democracia,

si ha de subsistir, debe oxigenarse en esta vital área de corrientes liberales." *Soto v. Srio. de Justicia,* supra, págs. 485–486. Máxime en situaciones, como la del caso de autos, en que están en juego "las dos mayores fuentes de legitimidad política y legal ... la franquicia electoral y la acción civil". (Énfasis suprimido.) *Alicea v. Córdova,* 117 D.P.R. 676, 690 (1986); *Torres v. Castillo Alicea,* 111 D.P.R. 792, 802–803 (1981).

■ Abordamos el reclamo de confidencialidad del Estado tomando como punto de partida que " 'el balance de intereses requerido por la Regla 31(b) debe realizarse de forma *estricta* a favor del reclamante de la solicitud y en contra del privilegio reconocido en dicha regla' ". (Énfasis suplido.) *Santiago v. Bobb y El Mundo, Inc.,* supra, pág. 162 esc. 4. Para que el Estado prevalezca, éste debe presentar prueba y demostrar la existencia de *intereses apremiantes de mayor jerarquía* que los valores protegidos por este derecho de libertad de información de los ciudadanos. Nuestra función judicial es "resolver si determinada información está cubierta por el manto de secretividad y, de estarlo, si ello es compatible con el ejercicio de derechos constitucionales protegidos". *Soto v. Srio. de Justicia,* supra, pág. 498.

■ Todo el andamiaje jurídico del Estado se apuntala en un frágil sostén. Sabido es que, en derecho probatorio, los privilegios responden a un interés gubernamental de proteger y promover determinada relación. Si bien se trata de reglas de exclusión fundadas en consideraciones de política pública —en las cuales se relega a un segundo plano la búsqueda de la verdad, E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia,* San Juan, Pubs. J.T.S., 1984, Vol. I, pág. 137— no es menos cierto que, por imperativos morales y sociales inmanentes, éstos están predicados en

el *presupuesto de legalidad.*(⁶) En otras palabras, no existe el privilegio si la relación fue con el propósito de hacer posible o ayudar a planificar o cometer un delito. Inexorablemente este presupuesto de legalidad enmarca las Reglas 31 y 32 de Evidencia, *supra*. Veamos.

En lo pertinente, la Regla 31 de Evidencia, *supra*, dispone:

> (A) Según usada en esta regla, "información oficial" significa información adquirida en confidencia por un funcionario o empleado público *en el desempeño de su deber* y que no ha sido oficialmente revelada ni está accesible al público hasta el momento en que se invoca el privilegio. (Énfasis suplido.)

A renglón seguido, la Regla 32 de Evidencia, *supra*, dispone:

> Una entidad pública tiene el privilegio de no revelar *la iden-tidad de una persona que ha suministrado información ten-dente a descubrir la violación de una ley del Estado Libre Aso-ciado de Puerto Rico o de los Estados Unidos de América*, si la información es dada en confidencia por el informante a un fun-cionario del orden público, a un representante de la *agencia encargada de la administración o ejecución de la ley que se alega fue violada* o a cualquier persona con el propósito de que la transmitiera a tal funcionario o representante. Evidencia so-bre dicha identidad no será admisible a menos que el tribunal determine que la identidad de la persona que dio la información

---

(⁶) Así trasluce de una lectura de los llamados privilegios estatutarios recogidos en las reglas siguientes: Regla 25(C)(1) de Evidencia, 32 L.P.R.A. Ap. IV, el privilegio *abogado-cliente* no aplica cuando "[l]os servicios del abogado fueron solicitados u obtenidos *para permitir o ayudar a cualquier persona a cometer o planear la comi-sión de un delito*, acto torticero o un fraude" (énfasis suplido); la Regla 26(C)(2) de Evidencia, 32 L.P.R.A. Ap. IV, no puede invocarse el privilegio *médico-paciente* si "[l]os servicios del médico fueron solicitados u obtenidos para *hacer posible o ayudar a cometer o planear la comisión de un delito* o de un acto torticero" (énfasis suplido); Regla 27(D)(7) de Evidencia, 32 L.P.R.A. Ap. IV, no existe el privilegio entre *cónyuges* cuando "[l]a comunicación fue hecha, total o parcialmente, con el propósito de hacer *posible o ayudar a cualquier persona a cometer o planear* la comisión de un delito, acto torticero o fraude" (énfasis suplido); Regla 29 de Evidencia, 32 L.P.R.A. Ap. IV, privilegio sobre la secretividad del *voto*, no opera si se determina que la persona votó ilegalmente; Regla 30 de Evidencia, 32 L.P.R.A. Ap. IV, privilegio de secretos del *negocio* inaplicable si tiende "*a ocultar fraude o a causar una injusticia*" (énfasis suplido).

ya ha sido divulgada en alguna otra forma, o que *la informa-ción sobre su identidad es esencial para una justa decisión de la controversia,* particularmente cuando es esencial a la defensa del acusado. (Énfasis suplido.)

Más adelante, la Regla 35 de Evidencia, 32 L.P.R.A. Ap. IV, presupone que se interpreten *"restrictivamente en rela-ción a cualquier determinación sobre la existencia de un privilegio".* (Énfasis suplido.)

 Así, el privilegio sobre *información oficial* de la Regla 31 de Evidencia, *supra,* requiere que la evidencia adquirida por el funcionario sea en el "desempeño de su deber". De más está decir que ningún funcionario tiene el "deber" de violar los derechos constitucionales de un ciudadano. Por su parte, la Regla 32 de Evidencia, *supra,* exige que la información suministrada por el informante sea "tendente a descubrir la violación de una ley del Es-tado Libre Asociado de Puerto Rico o de los Estados Unidos de América ...". *Excepto unos expedientes pertenecientes a unas agrupaciones que operan en el clandestinaje y se atri-buyen actos de violencia,* hemos podido directamente con-firmar lo estipulado por el Estado: *la información recopi-lada en expedientes de personas nada tenía que ver con la comisión de delitos públicos.*

 No cabe, pues, la interpretación propuesta. Sería un contrasentido que la prerrogativa del Estado de sus-traer información del escrutinio público pudiera afianzarse en el nocivo germen de la ilegalidad.([7]) Recuérdese que

---

([7]) A modo ilustrativo, del Informe de la Comisión de Derechos Civiles, reprodu-cimos el *modus operandi* siguiente:

"Indicaron que cada agente adscrito a esta sección [Inteligencia] estaba encar-gado, por sí solo o con el auxilio de otro compañero, de la vigilancia de personas o miembros de organizaciones. Como parte de sus funciones, los agentes tenían que estudiar los expedientes de los miembros de una organización, memorizar su conte-nido, conocer el liderato de la organización, sus lugares de reunión, la frecuencia de sus reuniones, y la existencia de casas de seguridad, si las hubiera. También reclu-taba informantes y confidentes para infiltrarlos en la organización.

"El trabajo que rendían los agentes que integraban esta sección se ajustaba a un patrón rutinario que era el siguiente: Se recibía una encomienda de investigación

que se suponía se hubiera originado luego del análisis de un informe de un agente encubierto o confidente. Este requerimiento de información que recibía el agente se conocía en el argot de la División como 'platillo'. El platillo' era un formulario con una serie de espacios en blanco conteniendo información personal del sujeto bajo vigilancia, su nombre, dirección, lugar de trabajo, número de seguro social, apodo y numerosa información personal y muchas veces confidencial sobre el ciudadano. Esta información tenía la finalidad de ayudar al agente investigador a localizar al investigado. Contenía además una descripción del ámbito particular de esa investigación ya que se suponía que ese 'platillo' respondía a una necesidad específica de información que había sido identificada y delimitada por el agente que había rendido el informe original, por la Sección de Análisis o por el jefe de alguna sección operacional de la División de Inteligencia.

"Una vez le era asignado ese 'platillo' a un agente, si éste no tenía una foto del sujeto, se dirigía al Departamento de Obras Públicas y obtenía copia del retrato de la licencia de conducir, el cual ampliaba. Otras fuentes consultadas eran los confidentes, información computadorizada en poder de la Policía sobre vehículos de motor, expedientes de gobierno, etc. Una vez localizado el individuo éste era sometido a continua vigilancia en autos sin rotular. Era además fotografiado y seguido a todos lugares. El propósito de esta vigilancia era verificar el requerimiento específico de investigación contenido en el 'platillo' y rendir el correspondiente informe de seguimiento o vigilancia.

· *"Para evadir la suspicacia o inducir la cooperación de los vecinos, era común que el agente investigador visitara el vecindario del investigado y mostrara una foto completamente distinta a la del sujeto investigado. Se le decía a los vecinos que en la casa del investigado se refugiaba un prófugo. Luego de proveer señas y descripciones de autos y acompañantes del supuesto prófugo que alegadamente se refugiaba en la casa del investigado, sus vecinos y familiares en ánimo de persuadir al investigador de que estaba equivocado, le proveían al agente la verdadera y deseada información sobre su real objeto de investigación. La más mínima seña que relacionara al investigado con un grupo independentista o con el requerimiento de información del 'platillo' hacía que el resultado de la investigación fuese 'positivo' y ameritaba la apertura de un expediente al investigado. Si ya tenía expediente abierto, la información obtenida se añadía al mismo.*

"Cuando la asignación de investigación se relacionaba con una actividad realizada por un grupo, la vigilancia del mismo requería la toma de fotos y películas así como la grabación y transcripción de discursos, ponencias y conferencias. El agente que asistía a la actividad tenía el deber de detallar en su informe todo lo que sucediera: los oradores que participaban, una síntesis de lo que expusieron, copia de la literatura repartida, consignas coreadas, contenido escrito de los cartelones y *una mención específica de todas las personas presentes que identificara.* Luego de la actividad, a la primera oportunidad que tuviera que podía ser en el inicio de la jornada de trabajo o al finalizarla, se reunían los agentes asignados a esta sección para examinar las fotografías de la actividad. Hacían un círculo alrededor del rostro de los asistentes que identificaban, les asignaban un número y por el dorso de la foto, al lado del número correspondiente, escribían el nombre del ciudadano identificado. Esas fotos junto a los informes de los agentes pasaban a la Sección de Análisis para ser procesadas.

"Como parte de la rutina de trabajo, a los agentes de esta sección se les entregaban diferentes expedientes de *independentistas* para que los estudiaran, se familiarizaran con su contenido y conocieran a la saciedad a los miembros de las diferentes organizaciones." (Énfasis suplido y escolio omitido.) Informe de la Comisión de Derechos Civiles, Discrimen y Persecución por Razones Políticas: La Práctica Gubernamental de Mantener Listas, Ficheros y Expedientes de Ciudadanos por Razón de

*Soto v. Srio. de Justicia*, supra, pág. 495, reconoció el privilegio al Estado en actividades lícitas relativas *"a la fase investigativa o preventiva del crimen"*. (Énfasis suplido.) Refuerza esta conclusión que la información sobre actos ilegales cometidos por el Estado es un evento que amerita ser conocido por la ciudadanía para poder ejercer sabiamente sus derechos.

La propia política pública que justifica este privilegio impide su reconocimiento en este caso. El privilegio protege a quien delata la comisión de un delito; no encubre a quien coacciona, persigue y limita el ejercicio de derechos constitucionales básicos del prójimo. ¿Quién estableció que pensar, expresar, defender y promover el ideario independentista es delito? Los agentes encubiertos de la División de Inteligencia de la Policía conocían la lesión constitucional en que incurrían investigando y vigilando sólo por razones ideológicas. Se cumple mejor con la política pública encarnada en la Constitución, revelando la identidad de los agentes, confidentes e informantes. Lo contrario crearía un peligroso precedente que podría propiciar que en el futuro se retornase a esta nefasta práctica.

"Una postura represiva gubernamental a veces puede generar una reacción de respaldo popular que excede los deseos visualizados por el gobierno. Este fenómeno lo percibió el joven Plinio, como gobernador romano de provincia, cuando pidió consejos al Emperador Trajano de cómo administrar castigos contra aquellos que profesaban el cristianismo. 'Ahora, que he comenzado a entender en este problema, como tantas veces ocurre', escribió, 'las denuncias se han esparcido y aumentado en variedad. Se ha circulado un panfleto anónimo que contiene los nombres de un número de personas acusadas'. Trajano le contestó, aconsejándole moderación en los procedimientos a seguir, y, a su crédito permanente añadió: 'Pero los panfletos cir-

su Ideología Política, 1ro de febrero de 1989, págs. 122–124.

culados anónimamente no pueden jugar ningún papel en las acusaciones. Crean el peor de los precedentes y están fuera del espíritu de nuestra época.'" (Traducción nuestra.) F.A. Allen, *Los crímenes de la política, las dimensiones políticas de la justicia criminal*, Cambridge, Harvard U. Press, 1972, pág. 58.

Revelar la información "es esencial para una *justa* decisión de la controversia". El proceso de excluir los nombres de los agentes encubiertos e informantes demoraría por años la entrega, propiciaría miles de controversias, implicaría unos gastos no justificables y, sobre todo, desvirtuaría la razón de las entregas de los expedientes.

Para apreciar y adjudicar justa e informadamente este extremo, ordenamos a los Comisionados que elevaran, como *muestra*, veinte (20) expedientes, los cuales tuvimos la oportunidad de examinar, y así arribar a nuestras propias conclusiones.

Fueron elevados en dieciséis (16) cajas de cartón. Contienen expedientes abiertos y conservados en la Oficina de Inteligencia de la Policía hasta 1987, a nombre de personas y organizaciones de ideología independentista. El tamaño de los expedientes varía. El promedio contiene aproximadamente ciento cincuenta (150) folios: uno pequeño de cincuenta (50) folios y uno grande que puede consistir de varios volúmenes añadidos al agotarse el espacio de la carpeta de cartón original.

Los expedientes individuales contienen un resumen, el historial personal del ciudadano o de la organización, fotos, transcripciones de informes de agentes y confidentes, discursos, recortes de periódicos, publicaciones, datos de sus vecinos, compañeros de trabajo, etc.

Sólo en tres (3) expedientes, correspondientes a *organizaciones*, encontramos múltiples memorandos, fotos y documentos relacionados con investigaciones criminales lícitas. No versan sobre personas particulares ni tampoco aquellas agrupaciones ni partidos políticos *bona fide*. Se

trata de agrupaciones que actúan clandestinamente y han asumido y aceptado públicamente, como medio para lograr sus fines, la amenaza y la violencia; incluso se han atribuido la autoría de diversos actos de naturaleza delictiva. Esta categoría —que denominaremos expedientes de *Organizaciones Clandestinas y Casos e Incidentes Particulares de Naturaleza Delictiva*— contiene documentación e información pertinente e ideológica, relacionadas entre sí, en la que, obviamente, el elemento ideológico resulta inseparable de los actos y las actividades objeto de investigación.

Específicamente, nos referimos a los expedientes de agrupaciones tales como el Ejército Popular Boricua (Macheteros), Comandos Armados de Liberación y Partido Socialista Revolucionario, cuya documentación, de su faz, trata sobre investigaciones legítimas.[8]

Resolvemos que estos expedientes no caen dentro del mandato judicial de entrega. Deben conservarse por la policía para uso en investigaciones *bona fide* sobre actos delictivos. El ilustrado tribunal de instancia, por conducto de los Comisionados, deberá remitirlos a la Policía. Igual trámite deberá seguirse al implantarse nuestro mandato con cualesquiera otros expedientes análogos.[9]

Aclarado este extremo —con base en ese mismo examen directo de los veinte (20) expedientes— distinto de la contención del Estado, estimamos razonable y altamente per-

---

[8] Cajas Núms. 5 y 6, expedientes identificados:

Y-4, Partido Socialista Revolucionario, núm. 4-1-12, 4 volúmenes. (Y-4(a) a Y-4(d)), Caja 6/6.

Y-5, Atentados contra miembros e instalaciones de la Marina. Caso Marina-Sabana Seca, núm. 4-91, 3 volúmenes. (Y-5(a) a Y-5(c)), Caja 6/6.

Y-2, Ejército Popular Boricua (los Macheteros), núm. 4-4-28, 4 volúmenes, (Y-2 (a) a Y-2(d)), Caja 5/6.

Y-3, Comandos Armados de Liberación, núm. 4-4-6, 2 volúmenes, (Y-3(a) y Y-3(b)), Caja 5/6.

[9] Independientemente de la posibilidad de que sean pocos o muchos expedientes, ciertamente esta tarea, sumamente sencilla y mecánica, no es comparable con la compleja, difícil y costosa pretendida expurgación de los nombres de agentes encubiertos, agentes, informantes, confidentes o de otras personas en los expedientes individuales, según el reclamo del Estado.

suasivo el análisis y cálculo de los Comisionados, avalado por el foro de instancia, del tiempo y las consecuencias de expurgar todos los nombres de los expedientes. Acceder conllevaría "perverti[r] la implantación del remedio o sea, la entrega de los expedientes. En primer término, se *ocultaría* a los perjudicados información que les sería vital para la solicitud y obtención de un remedio para vindicar sus derechos constitucionales. En segundo lugar, la magnitud de la labor de examinar en *detalle* todos los reclamos, primero por los abogados del Estado, luego por los Comisionados y seguido por el azaroso proceso de expurgar toda la información relativa a dichos reclamos que se encuentra en cada uno de los millones de folios que comprenden los 25,165 expedientes y aproximadamente 135,188 tarjetas abiertas por la Policía, *resultaría en un dispendio incalculable de tiempo, esfuerzo y dineros públicos*. Basta señalar un sólo ejemplo. Al abogado del Estado le tomó cinco (5) días laborables examinar el expediente del demandante licenciado Miranda Marchand para poder identificar todos los reclamos de confidencialidad que el Estado ha invocado. El examen posterior por los Comisionados requirió aproximadamente el mismo tiempo. A juzgar por esa experiencia, el examen de veinticinco mil ciento sesenta y cinco (25,165) expedientes tomaría alrededor de ciento veinticinco mil ochocientos veinte y cinco (125,825) días; lo que a razón de doscientos cuarenta y tres (243) días laborables al año, equivaldría a quinientos diecisiete (517) años y medio. En el supuesto de que el Estado empleara a tiempo completo a los cuarenta (40) abogados que integran la División de Litigios Generales del Departamento de Justicia para intervenir en el proceso, *éste se reduciría sólo un poco más de doce (12) años*. Resulta significativo que en la preparación de un mero inventario limitado exclusivamente al conteo de 135,188 tarjetas que obraban en el tarjetero electrónico del Archivo Central de la División de Inteligencia de la Policía, realizado durante 2 semanas, en agosto de 1987,

requirió la participación de 35 oficiales, agentes y emplea-
dos de la Policía". (Énfasis suplido.) Caso Núm. CE-89-578,
Parte I, *Exhibit* I, págs. 7–8.

El reclamo de confidencialidad sobre la identidad
de las personas que de buena fe —sin conocimiento de la
ilegalidad de la investigación— cooperaron con las autori-
dades, tampoco encuadra en la protección vislumbrada en
la Regla 32 de Evidencia, *supra*. Es requisito ineludible
"que [la] información [haya sido] obtenida y 'adquirida en
confidencia' ". *Santiago v. Bobb y El Mundo, Inc.*, supra,
pág. 164. Presupone que la persona, al momento de ofre-
cerla, tiene una expectativa razonable de que su identidad
no ha de ser revelada. *Además, la información ha de refe-
rirse a hechos "tendente[s] a descubrir la violación de una
ley ...".* (Énfasis suplido.) 32 L.P.R.A. Ap. IV, R. 32.

Por esta razón, es insostenible la contención del Estado
de que hay que *proteger la identidad de estas personas que
cooperaron "con los agentes del orden público y no tenían
razón alguna para sospechar que la investigación que se
llevaba a cabo podía ser inválida".* (Énfasis suplido.) Caso
Núm. CE-89-578, Parte II, Escrito en cumplimiento de or-
den, pág. 7. Conforme el *modus operandi* rutinario, la in-
formación sobre un investigado proveniente de amigos, ve-
cinos, alcalde o médico del pueblo era sutilmente
adquirida; *no estaba directamente relacionada con la comi-
sión de un delito.* Los agentes usaban distintas técnicas
desorientadoras.

Lo expuesto nos lleva ineludiblemente a resolver que
aquellas personas catalogadas de informantes ocasionales
(el vecino, el alcalde, el cartero, el compañero de trabajo, el
médico del pueblo, el juez, etc.), de quienes el Estado ob-
tuvo directa o sutilmente información, tan sólo ejercitaban
sus derechos constitucionales a expresar su opinión sobre
una persona. Esa información podía ser la impresión pú-
blica en la comunidad, la apreciación individual o aquella

que, a fin de cuentas, podríamos catalogar como *chisme*, fenómeno humano. Recordemos que los agentes encubiertos tenían la directriz de guardar la más absoluta discreción en su desempeño para no levantar sospechas. Los comentarios y la información suministrada por vecinos, etc. versaban sobre sus apreciaciones y comentarios subjetivos de esas personas y sus actividades.

Pero hay más. El derecho ciudadano a la libre expresión, a tener su propio credo ideológico y a mantener la afiliación política de su preferencia, es el basamento central para condenar la práctica gubernamental de mantener las llamadas listas y expedientes por razones ideológicas. Ese derecho no es atributo exclusivo ni pertenece a ninguna ideología o partido, sino que se desparrama sobre toda nuestra sociedad. Como premisa cardinal, de manera intrínseca, conlleva aceptar que otras personas tienen derecho a diferir y, por ende, pueden criticar a quienes sostienen un ideal político contrario en cuanto a las tres (3) tendencias y movimientos que históricamente han enmarcado la discusión sobre nuestro destino político: independentista, autonomista y estadista. Bajo este prisma, difícilmente puede construirse un argumento válido que a priori condene o exponga a una acción judicial en daños y perjuicios exitosamente a toda persona que brindó información sobre independentistas. *Si algo debe quedar bien claro en este proceso es que ser independentista no constituye un delito, pero no podemos caer en la superficialidad de asfixiar la libre expresión de quienes son contrarios a ese ideario. Con sujeción a las normas vigentes en materia de daños, la responsabilidad civil y la condena total y única tienen que recaer sobre el Estado que montó todo un costosísimo y elaborado aparato oficial para pervertir la útil facultad investigativa de la Policía y así mal utilizar esas discrepancias ciudadanas.*

El no tachar el nombre de las personas que ofre-

cieron información sobre los independentistas no tiene impacto sobre el crimen ni afecta las futuras investigaciones policiacas en torno a la criminalidad. El mensaje judicial de nuestro mandato debe ser claro: en el ámbito político, la estructura democrática institucionalizada en la Carta de Derechos de nuestra Constitución, fomenta la diversidad ideológica, y dentro de la Constitución es permisible la discrepancia, incluso aquella prédica verbal que raya en el extremo de la intolerancia política. Aunque la forma de gobierno e ideología aprobada por una mayoría predomina sobre las aspiraciones de la minoría, ésta tiene un espacio anchísimo para legítimamente expresar su disidencia y para, también, aspirar a convertirse en mayoría.

El próximo mes de julio se cumplirán cinco (5) años desde que el ilustrado foro de instancia, el 16 y 23 de julio de 1987, emitió originalmente su orden de "Entredicho provisional" y de *"Injunction* preliminar", respectivamente. Los cinco (5) años transcurridos evidencian que el tiempo se ha encargado de situar en su correcta perspectiva y confirmar la inutilidad de estos expedientes en el ámbito de la persecución de delitos. Aparte del Instituto Puertorriqueño de Derechos Civiles, sobre la prescripción de delitos, curiosamente, durante estos años el Estado no ha solicitado ni un solo expediente o documento para formular una denuncia o acusación.

■ Lo anterior constituye una razón más para concluir que la entrega de estos expedientes no afectará la labor investigativa de la Policía ni a los agentes encubiertos[10] en su objetivo principal de legítimamente prevenir el

---

[10] Nuestra decisión en nada menoscaba el valor de la figura del agente encubierto, necesaria para el descubrimiento de una gran variedad de actividades criminales. Su utilidad no se discute. Si no fuera por su labor, muchos delitos permanecerían impunes.

Por eso reiteramos la regla general de que no puede ser divulgada información recopilada en el curso de una investigación en la fase preventiva del crimen, y menos que requiera la identidad de informantes, confidentes, testigos, agentes encubiertos o la de cualquier empleado o funcionario público del Estado, hasta que culmine la

delito o perseguir y detener a quienes lo cometen. Tampoco cohibirá a la ciudadanía en general de cooperar con esa labor. El privilegio sobre el secreto de la identidad de los informantes queda intacto y disponible para esgrimir el Estado en los casos apropiados. No procede la solicitud de retrasar el descubrimiento de la identidad de las personas mencionadas en los informes. El reclamo es que tachemos, borremos y, con ello, neguemos su existencia de una vez y para siempre.

██ Del examen detallado de los expedientes elevados surge que presumiblemente algunas de las personas involucradas fueron objeto de investigaciones criminales que en su origen estuvieron justificadas. En nuestro ordenamiento penal existe una notable diferencia entre una investigación y un arresto; el criterio exigido para justificar el inicio de la primera es menos riguroso que aquel de motivos fundados para creer que se ha cometido un delito y proceder a un arresto sin orden. Regla 11(c) de Procedimiento Criminal, 34 L.P.R.A. Ap. II. Este requisito se traduce en que el agente descanse en la apreciación razonable de sus observaciones o en la información confiable.

Ciertamente existe mayor discreción para iniciar una investigación. Sin embargo, la decisión debe estar basada en observaciones o informaciones indicativas de una posibilidad real de actividad delictiva. Aunque esa gestión no es fácil, no podemos pensar que no existen parámetros que guíen el iniciar o cerrar una investigación criminal. Ello equivaldría a fomentar una total arbitrariedad policíaca que choca con nuestra forma de gobierno democrático en que todo operativo investigativo es un medio, no un fin.(11)

_____

investigación y comience el proceso acusatorio. Lo contrario podría frustrar los resultados de una investigación legítima e incluso poner en peligro la vida de esas personas.

(11) "La labor de identificar y controlar al terrorista político es extraordinariamente difícil, principalmente porque está envuelto el delito político. Es aparente que una agencia policiaca no puede proceder a identificar a personas envueltas en actos

█ Los expedientes elevados confirman que una vez esas investigaciones perdieron su razón de ser originales, se usaron para perpetuar un sistema para fichar y mantener expedientes basado únicamente en diferencias ideológicas. Salvo las excepciones indicadas previamente sobre agrupaciones clandestinas, los expedientes y demás documentos aquí implicados no están protegidos por el aura de confidencialidad que caracteriza la legítima investigación criminal.

*Recapitulando,* no procede en derecho ni en justicia los reclamos del Estado sobre los agentes encubiertos, confidentes e informantes consuetudinarios o incidentales. No hay prueba ni razones para creer que el dar a conocer sus identidades, en el contexto específico del caso, conlleve riesgos a sus vidas.[12] *Así concluirlo equivaldría a "descriminalizar" la práctica a costa de "criminalizar" el remedio.* Afirmarlo judicialmente implicaría desmentir lo que el Estado ahora acepta: que no tuvo razones legítimas para confeccionar estas listas y expedientes. Nuestra historia de pueblo demuestra que los argumentos del Estado son esencialmente *especulativos.*

Finalmente, existen, además, varios fundamentos de peso, inspirados en un justo pragmatismo judicial que in-

---

de violencia política, como el poner bombas de tiempo en bóvedas bancarias, sin someter a vigilancia muchas actividades políticas no delictivas y a un gran número de personas que no han y nunca recurrirían a actos de violencia y terror. *Por ende, en estos casos la función policiaca está en constante peligro de infringir los valores políticos básicos de la comunidad.* Es alarmante que grandes segmentos de la sociedad americana conciban como opresiva aquella actividad policial, legítima y vital. En parte esto es cierto, debido a que en ocasiones, la policía violenta valores políticos o revela una insensibilidad hacia, o ignorancia a estos, incluso al convenio político, y por ende se ha hecho vulnerable a la sospecha corrosiva. *El peligro no es que a la policía se le niegue el respaldo cuando lo merece, sino también que en otros segmentos de la comunidad gane apoyo inmerecido."* (Énfasis suplido.) F.A. Allen, *Los crímenes de la política, las dimensiones políticas de la justicia criminal,* Cambridge, Harvard U. Press, 1972, pág. 69.

[12] En la vista oral, la representación legal del Estado informó desconocer cuántos agentes encubiertos e informantes —al momento, desempeñándose en funciones investigativas de delitos— quedarían descubiertos o expuestos a peligros. T.E., págs. 17–18.

clinan la balanza a favor de la entrega total. La exclusión de esos nombres tornaría incoherente la información en los expedientes. *De facto*, equivaldría a ordenar su destrucción física, pues acabaría con su valor jurídico, social e histórico. Esa exclusión significaría desaparecer todo nombre de esos documentos, únicos existentes. Las consecuencias negativas son evidentes: sin razón encubriría para siempre identidades; facilitaría al Estado liberarse de cualquier responsabilidad civil; limitaría *a priori* sustancialmente el derecho de los perjudicados al descubrimiento de prueba,[13] y dificultaría el derecho a exigirle al Estado la reparación de agravios, aun cuando éste, en la vista oral, reconoció su responsabilidad. T.E., pág. 30.

## IV

Réstanos examinar el señalamiento del Estado sobre las instancias situacionales que nutren el concepto y reclamo de los denominados *terceros*. Hemos constatado que se trata de personas cuyos nombres aparecen en expedientes ajenos, mencionados "incidentales", que pueden tener o no su propio expediente. Repetimos, la característica común de estos incidentales es que sus nombres aparecen en un *expediente ajeno*.

Aclaramos que esos mencionados incidentalmente no

---

[13] Precisamente, para garantizar la legitimidad documental y valor probatorio y evitar "la posibilidad de que una vez entregada[s] la[s] tarjetas o cartapacio sus folios sean alterados (en particular introduciendo otros folios)" (Caso Núm. CE-89-578, Parte I, *Exhibit* III, pág. 86), es menester *el cumplimiento estricto* de la Regla 4.1.2 para hacer viable la entrega de expedientes abiertos ilegalmente por la División de Inteligencia de la Policía de Puerto Rico (en adelante Reglas para la Entrega de Expedientes) a los efectos de que antes de entregarse el expediente o las tarjetas, "el Estado se asegurará de haber enumerado y marcado con un sello de goma y haber rubricado todos y cada uno de los folios que contiene el expediente". íd.

*Como salvaguarda*, consideramos necesario enfatizar que al entregarse el expediente o tarjetas se cumpla también rigurosamente con la Regla 5.1 para la Entrega de Expedientes: se tome constancia y certifique, para mantenerse bajo la tutela y custodia del tribunal, el original del *recibo de entrega* contentivo del número de folios de cada uno de esos expedientes o tarjetas.

son confidentes, vecinos o personas que de alguna manera u otra brindaron comentarios o algún tipo de información a la Policía; estos últimos están visualizados en este recurso como confidentes, informantes y agentes cuyo carácter secreto, en cuanto a sus identidades, reclamó el Estado bajo la Regla 32 de Evidencia, *supra*, hemos analizado y rechazado.

Según el escrito de los Comisionados de 23 de junio de 1989, los reclamos del Estado que ahora nos ocupan son susceptibles de agruparse en función de las categorías siguientes:

1. *Actividades públicas*: cubre la adquisición de "nombres de terceras personas que participaron en actividades *públicas* en las que su presencia era *notoria* y en la gran parte, si no en todos los casos, ante la presencia de los medios publicitarios. Las actividades en que se encontraban los terceros consistían, entre otras, de marchas, piquetes, caravanas, recibi[mientos o despedi]das en aeropuerto, actos públicos de estudiantes, reuniones en el Colegio de Abogados, asistentes a Juegos Panamericanos, asistentes a vistas ante los tribunales en casos, (en casos de ley de armas, explosiones, confiscación, arrestos de estudiantes, habeas corpus, acometimiento y agresión, etc.), asistencia a funerales, piquetes por excarcelación de presos nacionalistas, piquetes ante la Fortaleza, protesta ante Naciones Unidas, participantes en el Hotel Condado con congresistas de Estados Unidos, asistentes a foros en la Universidad de Puerto Rico, personas que viajaron a Cuba, piquetes a Asamblea de Federación de Músicos, marcha del Capitolio a Corte Federal, asistentes a conmemoración del Grito de Lares, actos en el Ateneo Puertorriqueño, oradores en varios actos públicos, piquetes ante la Compañía de Teléfono, piquetes a playa de la Marina, arrestados por la policía por acostarse en la vía pública, participantes en protesta de agrupación de APATE, asistentes a marcha contra el servicio militar obligatorio, y otros actos públicos similares.

Los Comisionados entienden que los participantes en los actos públicos señalados precedentemente, como todos aquellos de naturaleza similar, *renunciaron a su derecho de intimidad al hacer acto de presencia pública*, precisamente para que fueran vistos y contados y se hiciera notorio su apoyo público a la causa que motivaba el acto. Tales reclamos, por tanto, deben ser *denegados*". (Énfasis suplido y en el original.) Caso Núm. CE-89-578, Parte I, *Exhibit* VIII, págs. 181–182.

2. *Agentes u oficiales autores de memorandos internos*: se reclama la "protección a funcionarios u oficiales que en el curso ordinario de sus funciones transmitían a sus superiores, subalternos u otra dependencia de la policía, la información recibida de agentes, confidentes o informantes. El reclamo rebasa el ámbito de protección que estableció el Tribunal. Existe una gran diferencia entre un agente, confidente o informante que origina la información vis a vis un funcionario del Estado que se limita a transmitir oficialmente la información recibida en el cumplimiento de su deber. En consecuencia, recomendamos se *deniegue la solicitud*". (Énfasis suplido.) Caso Núm. CE-89-578, Parte I, *Exhibit* VIII, pág. 182.

3. *Personas en reuniones de casas privadas identificadas desde el exterior*: versa sobre personas que asistieron a reuniones en casas privadas y "cuyos nombres y número de tablilla fueron tomados por agentes, confidentes o informantes *que se encontraban fuera de la residencia*. En estas situaciones, el que ha de recibir su expediente sabe quiénes eran las otras personas que con él compartieron en la reunión de que se trata. Existe en el expediente del demandante Graciany Miranda Marchand, al igual que en los de las otras personas que allí estaban, *una lista de los asistentes*. En tales casos, ¿son terceros los unos respecto de los otros cuando todos tenían conocimiento personal de quienes allí estaban? ¿No equivale a una renuncia del derecho de intimidad —si alguno tenían— el asociarse lícita

y públicamente? No se trata de la publicación de los nombres de los participantes a los medios noticiosos o a cualesquiera otras personas ajenas al grupo, quienes son los verdaderos terceros, a los que a nuestro juicio se refirió el Tribunal. Debemos concluir, pues, que cuando el Tribunal expresó que 'esa información debe mantenerse fuera del escrutinio público', no se refería a mantener su confidencialidad respecto a las otras personas participantes en la actividad que se encontraban en la misma situación. Según el Diccionario de la Real Academia Española, un tercero es, 'persona que no es ninguna de dos o más de quienes se trata o que intervienen en un negocio de cualquier género'. *Es evidente que los allí presentes no eran terceros entre ellos. De todas formas, si algún derecho de intimidad pudieron haber tenido, su presencia allí constituyó una renuncia de tal derecho entre ellos"*. (Énfasis suplido.) Caso Núm. CE-89-578, Parte I, *Exhibit* VIII, págs. 182–183.

4. *Personas que asistieron a la vista de tribunales*: Esta categoría corresponde a "los nombres de las personas que asistieron a varias vistas públicas celebradas en los tribunales, así como los nombres y el número de clave de los expedientes de los abogados que representaban a las partes y [de los agentes], policías u otras personas que fueron citadas judicialmente para que comparecieran como testigos. Se trataba de vistas públicas en casos de arrestos de estudiantes, ley de armas, acometimiento y agresión, explosivos, fijación de fianza y otros extremos. Estas son funciones judiciales públicas y los que allí comparecen no están protegidos por ningún privilegio. Reiteramos que solamente los que allí comparecieron quedarán enterados de dichos nombres al recibir sus correspondientes expedientes. Nuestra recomendación es que se deniegue este reclamo de confidencialidad". Caso Núm. CE-89-578, Parte I, *Exhibit* VIII, págs. 183–184.

Frente a estas categorías, y para sostener su posición, el Estado parte de la premisa de que cumple a cabalidad los

requisitos de *ius tertii* para invocar los derechos constitucionales de terceros. Refiere su contención a "aquellos terceros cuya identificación conllevaría, por deducción lógica, revelar la identidad de informantes y confidentes" y a los "terceros incidentalmente mencionados en un expediente ...". Caso Núm. CE-89-578, Parte II, Escrito en cumplimiento de orden, pág. 12. A título de ejemplo, desde su petición de *certiorari*, expuso el Estado:

> ...[L]os terceros que aparecen mencionados al relatarse o describirse una actividad pública no tienen la misma expectativa de privacidad que aquellos que se mencionan cuando se describe una actividad privada. Por ejemplo, aquella que se desarrolla en una residencia privada. El hecho de que hubiesen varias personas en la reunión o actividad privada no milita en contra de nuestra posición por cuanto siempre corresponde a ese tercero revelar *públicamente* su participación en la actividad y no a sus compañeros.
>
> . . . . . . . .
>
> No existe controversia de que, según surge de los expedientes objetos del litigio, cuando un agente informante acudía a una reunión donde se encontraba el sujeto del expediente, dicho agente acostumbraba hacer una lista de todas las personas que se hallaban en la reunión, lista que podía pasar a ser parte de los expedientes de todas y cada una de las personas que se encontraban en la lista en cuestión. (Énfasis suplido.) Caso Núm. CE-89-578, Parte I, Petición de *certiorari*, págs. 23–25.

En su abono, el Estado reproduce los argumentos previos de la Regla 31 de Evidencia, *supra*. Expone el criterio de que se trata de "información oficial", cuya divulgación sería perjudicial a los intereses del Gobierno y lesiona derechos fundamentales de terceros. *Tampoco tiene razón.*

La eliminación de los nombres de los alegados "terceros" no constituye un reclamo válido cobijado por las excepciones reconocidas en *Santiago v. Bobb y El Mundo, Inc.*, supra, y en *Soto v. Srio. de Justicia*, supra. Los argumentos del Estado parten de una premisa errónea y son esencialmente especulativos.

En primer lugar, en la dimensión *procesal*, el Estado no satisface aquí, con el rigor jurídico necesario, los cuatro (4) requisitos de *ius tertii* que determinan la capacidad de un litigante para invocar los derechos constitucionales de terceros, a saber: " '(1) el interés del litigante; (2) la naturaleza del derecho invocado; (3) la relación existente entre el litigante y las terceras personas; y (4) la factibilidad de que los terceros puedan hacer valer tales derechos en una acción independiente ...' ". *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 272 (1975). Véase *Pueblo v. Hernández Colón*, 118 D.P.R. 891, 898 (1987).

No existe similaridad de intereses, de forma tal que el Estado, como litigante, al buscar beneficiarse a sí mismo, busque y logre beneficiar al tercero. De hecho, apreciamos que sus intereses y los de las personas nominadas son antagónicos, producto directo o indirecto de la conducta ilegal gubernamental. ¿Cómo pretende ahora ser el paladín de la intimidad el que violó por años ese mismo derecho? Aunque afirma que su interés es protegerlos del "estigma", resalta a la vista que el principal móvil es monetario, a saber, evitar "un sinnúmero de reclamaciones adicionales en un futuro[, l]as cuales no tan sólo recargarán el ya tan congestionado calendario de los tribunales, sino que innegablemente representarán una gravísima carga económica para el Estado Libre Asociado". Caso Núm. CE-89-578, Parte I, Petición de *certiorari*, pág. 24.

Ahora bien, más allá de la ausencia de capacidad en lo *procesal* bajo la doctrina de *"ius tertii"*, en lo *sustantivo*, el señalamiento está basado en un concepto erróneo: caracterizar "terceros" a personas participantes en una reunión. Nos explicamos.

En derecho, *tercero* es aquella persona inicialmente *extraña* a la relación jurídico-procesal, negocial, confidencial, etc. entre dos (2) o más partes de esa relación

principal. El *tercero* entra al ámbito de acción de las partes por voluntad propia, a requerimiento de alguna de ellas o alguna autoridad concernida con el fin de introducir determinado factor o elemento susceptible de influir sobre el desenvolvimiento del proceso. G. Cabanellas, *Dicccionario Enciclopédico de Derecho Usual*, 20ma ed., Buenos Aires, Ed. Heliasta S.R.L., 1981, T. VIII, págs. 45–46. Sólo al ingresar en el área del proceso ajeno puede el *tercero* venir a constituir parte en él.

Por definición, una relación entre partes que pretendían mantener la confidencialidad, al requerir o permitir la intervención de un *tercero* en algún momento, pierde entre ellos su carácter de confidencialidad; aquello que se define como confidencial excluye la intervención de un sujeto extraño.

A tono con este marco conceptual, la lista preparada por un agente encubierto de todas las personas que se hallaban en determinada reunión, ineludiblemente contenía los nombres de quienes, al participar en ésta, lógicamente entre sí renunciaron a toda expectativa de intimidad. El verdadero "tercero" (no en calidad procesal) fue el Estado, intruso, que a través del agente encubierto no fue invitado a participar. Esta misma razón derrota la fuerza persuasiva de la propuesta de que ordenemos tachar los nombres de los expedientes, a base de que no habrá "control alguno sobre lo que haga [el sujeto del expediente] con la información que se encuentre ...". Caso Núm. CE-89-578, Parte I, Petición de *certiorari*, pág. 25. A fin de cuentas, ese sujeto, al recibir el expediente, podrá hacer con la información lo mismo que pudo haber hecho a raíz de la reunión: si lo desea, revelar a otros su celebración y diálogo con "los terceros". *De más está decir que la entrega del expediente no autoriza su uso inadecuado o ilegal por el titular de la información; sería un contrasentido, después de lo arduo, afanoso y costoso de los trámites judiciales diseñados para*

*salvaguardar la identidad de las personas a quienes se les abrió y conservó ilegalmente un expediente.*

Incurre el Estado en un argumento *circular* al sostener que divulgar esos nombres podría causarles daños y sería privarles del debido proceso, pues se verían afectados *sin haber sido oídos antes.* Aparte de que fue el Estado quien originalmente los colocó en esa precaria posición, ¿cómo puede ahora elaborar un argumento basado en la necesidad de oírles si, precisamente, de acceder nosotros a su pretensión desaparecería toda huella de su intromisión ilegal?

Evidentemente el Estado no posee una relación *bona fide* que le permita actuar en protección de estas personas que, como coparticipantes de una reunión privada, no son terceros entre sí. Enfatizamos: el verdadero tercero (no procesal) fue el Estado, extraño que subrepticiamente intervino como coparticipante no invitado en múltiples reuniones y actividades.

## V

Un autor ha dicho que "en una democracia política la vida no es fácil ni cómoda. Desde el punto de vista psíquico está llena de tensiones y fricciones. Ofrece poco esparcimiento para quienes el relajarse sea el mayor logro humano. No es un sistema que congenia con aquellos que están convencidos que hemos alcanzado la perfección, o al menos, logrado una sociedad tan buena que debemos congelarla para siempre. *Por el contrario, la atmósfera de una sociedad democrática es de perpetua contienda; pues el derecho a disentir incluye, por necesidad, el derecho a ser disidente, a ser quisquilloso, a ser contendiente".* (Énfasis y traducción nuestros.) D. Fellman, *The Limits of Freedom,* Rutger U. Press, 1959, pág. 90. Afirma Samuel Pisar en su obra *De la Sangre y de la Esperanza,* que " 'nosotros pode-

mos no tener que vivir en el pasado, pero el pasado vive en nosotros' ".([14])

Estos pensamientos compendian el espíritu de nuestra razón de decidir (*ratio decidendi*). La intensidad y la naturaleza del agravio constitucional nos impiden refrendar la tesis del Estado, de la Asociación y de la Federación de la Policía. "Frente a la tentación permanente de las élites gobernantes de concebir la legalidad como instrumento coyuntural de dirección y rectificación de la acción política, sólo puede alzarse la conciencia del nuevo papel histórico del juez, en cuanto defensor de estructuras jurídicas muy profundas y garantes del respeto y vigencia a unos valores que no son producto de un pacto político o de una coyuntura social, sino que pertenecen al legado y al ideal humanista de occidente." A. Díaz Suárez, *Los jueces ante la crisis de la justicia*, 523 Rev. Gen. de Derecho 1669, 1675 (1988).

*Se dictará sentencia confirmatoria y devolverán los autos para los trámites ulteriores correspondientes, compatibles con lo aquí resuelto.*([15])

Los Jueces Asociados Señores Hernández Denton y Fuster Berlingeri emitieron respectivamente unas opiniones

---

([14]) Citado por A. Sánchez de la Torre, *Desde la justicia de la venganza hasta la justicia civil*, XC Rev. Gen. Leg. Jur. 357 (2da época 1985).

([15]) Nos hemos percatado de dos (2) lagunas en las reglas aprobadas por el ilustrado foro de instancia. No se dispuso de un término máximo para que las personas o entidades notificadas de la existencia de expedientes o tarjetas comparecieran a informar si tenían interés en recibirlos. Consideramos que sesenta (60) días son suficientes. El tribunal de instancia, por conducto de los Comisionados, deberá, mediante edicto o aviso, informar a toda la ciudadanía de la vigencia de este término.

La segunda laguna es que no se visualiza la retención y conservación de aquellos expedientes y tarjetas no reclamados, de interés general y valor histórico, y que deben formar parte del acervo cultural y político de nuestro pueblo. Según la Regla 7 para la Entrega de Expedientes, todos los expedientes y las tarjetas no reclamados, posteriormente serán destruidos.

El foro debe, como parte del mandato —previa citación y audiencia de las partes— examinar y reglamentar la retención y conservación en el Archivo Central de la Rama Judicial u otro lugar seguro designado, los expedientes y tarjetas con valor histórico. Su conservación será en sobres sellados y lacrados, por determinado número de años, para posteriormente ser transferidos y entregados a la custodia de la Universidad de Puerto Rico para fines investigativos y académicos.

de conformidad. El Juez Presidente Señor Andréu García se inhibió.

— O —

Opinión de conformidad emitida por el Juez Asociado Señor Hernández Denton.

I

Suscribimos la opinión del Tribunal que reafirma el principio rector de nuestro ordenamiento constitucional de que la dignidad del ser humano es inviolable.(¹) De este modo se ratifica que la Constitución del Estado Libre Asociado de Puerto Rico prohíbe que el Estado mantenga un sistema de vigilancia e investigación sobre personas y agrupaciones por razones ideológicas. Esta práctica constituye un discrimen impermisible por razón de creencias políticas y una indebida restricción de la libertad de asociación(²) y del derecho de libre expresión,(³) y una violación crasa del derecho a la intimidad(⁴) de su hogar y sus

---

(¹) "La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana." Art. II, Sec. 1 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 257.

(²) "Las personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares." Art. II, Sec. 6 de la Carta de Derechos, Const. E.L.A., *supra*, pág. 275.

(³) "No se aprobará ley alguna que restrinja la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios." Art. II, Sec. 4 de la Carta de Derechos, Const. E.L.A., *supra*, pág. 265.

(⁴) "Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar." Art. II, Sec. 8 de la Carta de Derechos, Const. E.L.A., *supra*, pág. 292.

papeles.([5]) Anteriormente, al endosar la opinión del Tribunal en *Noriega v. Gobernador*, 122 D.P.R. 650, 701 (1988), reconocimos que desde la década del treinta los Gobiernos han utilizado estos métodos investigativos que reflejan una marcada intolerancia contra los sectores que cuestionan los intereses del Estado:

> Particularmente nociva a la vida comunitaria y democrática de nuestro país ha sido la práctica, originada durante la administración del General Winship y utilizada por todos los gobernantes hasta ahora, de confeccionar listas de personas y grupos minoritarios que promueven [actividades] ... legítimas y legales. Aunque "las listas" han incluido a personas y entidades de diversas ideologías políticas, ha sido el movimiento independentista quien con más fuerza ha sufrido las consecuencias de este método coercitivo. *Noriega v. Gobernador*, supra, pág. 701.

También señalamos que tanto en 1959 como en 1970 la Comisión de Derechos Civiles había criticado la preparación de "las listas" por constituir "una práctica peligrosa y a veces ilegal de investigación policial sobre la conducta y actividades de individuos y grupos". *La vigilancia e investigación policiaca y los derechos civiles*, 1970–CDC–014, 2 Der. Civ. 27, 54 (1973). En particular, la Comisión de Derechos Civiles censuró el uso de estas listas para efectuar arrestos masivos de sectores independentistas en 1950 y en 1954.

A pesar de los señalamientos de dicha comisión, el Estado continuó estas técnicas y desarrolló nuevas modalidades investigativas. Las actitudes que dieron lugar a la recopilación, la clasificación y el archivo de información política han persistido hasta nuestros tiempos y han generado a su vez actuaciones represivas del Estado que han culminado en la muerte de independentistas en la Masacre

---

([5]) "No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables ...." Art. II, Sec. 10 de la Carta de Derechos, Const. E.L.A., *supra*, pág. 299.

de Ponce, Masacre de Río Piedras y en el Cerro Maravilla. Véase *In re Colton Fontán*, 128 D.P.R. 1 (1991).

En 1989, a raíz de unas declaraciones públicas de uno de los acusados por los sucesos del Cerro Maravilla, la Comisión de Derechos Civiles indagó en estos métodos investigativos de la Policía y halló que estas técnicas habían sido consentidas y toleradas durante este siglo por todas las administraciones gubernamentales. Informe de la Comisión de Derechos Civiles, Discrimen y Persecución por Razones Políticas: La Práctica Gubernamental de Mantener Listas, Ficheros y Expedientes de Ciudadanos por Razón de Ideología Política de 1ro de febrero de 1989 (en adelante Informe), pág. 374.

También concluyó que a través de los años estas violaciones habían sido condonadas por amplios sectores del país y que los grupos afectados las habían aceptado como parte de su diario vivir.

> La persecución y el discrimen llegaron a ser parte de nuestra existencia cotidiana.... Los independentistas casi llegaron a aceptar esta práctica como parte de su destino, como resultado lógico y necesario de la opción ideológica ejercitada por ellos. No parecía haber una voluntad social capaz de persuadir a los perseguidores de que debían dejar en paz a los perseguidos. Informe, *supra*, pág. 374.

No fue hasta la presentación del pleito de autos que el Gobierno aceptó la inconstitucionalidad de este método investigativo. Sin embargo, el Estado objetó el remedio diseñado por el Tribunal Superior para devolver los expedientes a los afectados y en dos (2) ocasiones ha recurrido ante esta Curia para que revisemos la decisión de dicho foro. Nuevamente confirmamos el cuidadoso remedio diseñado por el ilustrado Tribunal Superior.

También avalamos su determinación de que no procede el reclamo de confidencialidad de la identidad de los agentes y confidentes que participaron en estas investigaciones. Al refrendar su dictamen, requerimos la entrega inme-

diata de las carpetas a las personas afectadas y no accedemos a la petición del Estado que dilataría por varios años la devolución de estos expedientes mediante un costoso procedimiento de eliminación de los nombres de los investigadores, agentes encubiertos y confidentes.

Con la resolución del caso de autos cerramos uno de los capítulos más nefastos de la historia constitucional de nuestro país y ponemos de manifiesto la función por excelencia de los tribunales, que es consustancial con una estructura democrática apuntalada en la Carta de Derechos.

## II

Un examen minucioso de todas las carpetas elevadas por los Comisionados revela claramente que por más de cuarenta (40) años el Estado ha vigilado y perseguido a miles de puertorriqueños tanto en la intimidad de su hogar, como en sus talleres de estudio y de trabajo, y en las agrupaciones cívicas, religiosas y políticas a las que pertenecían. También se desprende que aunque fue objeto de investigación todo el espectro de nuestra sociedad, en la mayoría de los casos, las víctimas eran personas y agrupaciones identificadas con el movimiento independentista puertorriqueño. Entre las personas investigadas encontramos a líderes políticos y sindicales, estudiantes, trabajadores, profesionales y ministros de iglesias. Además, hay carpetas de personas identificadas con el movimiento autonomista y con diversas causas, incluso la defensa de la mujer y del ambiente, la campaña en contra del servicio militar obligatorio, amnistía internacional y el pacifismo.

Las carpetas contienen el historial personal de cada ciudadano investigado y narran su participación en actividades políticas calificadas por la Policía, en casi todos los casos, como de naturaleza separatista o subversiva.

Con excepción de las carpetas de las agrupaciones clandestinas, la información recopilada está vinculada a actos

y actividades legítimas protegidas tanto por la Constitución de Estados Unidos como por la de Puerto Rico. Entre éstas se destacan los discursos en actividades públicas, escritos publicados por los medios noticiosos, piquetes y reuniones de sus respectivas agrupaciones.

Los investigadores policiacos asistían a clases en la universidad para escuchar a profesores, participaban en huelgas estudiantiles para identificar a sus líderes y colaboradores, y miraban hasta por las ventanas de los hogares de los padres de los investigados para averiguar qué leían y qué veían por televisión. Las carpetas, también, contienen recortes de periódico y copia de los discursos y los escritos divulgados por los medios noticiosos. Incluyen informes periódicos preparados por los agentes mediante entrevistas con los vecinos, amigos, patronos y compañeros de trabajo y múltiples fotos individuales y grupales.

Nuestro examen confirma los siguientes hallazgos de los Comisionados, Lcdos. Ángel M. Martín y Abraham Díaz González, sobre la naturaleza de estas actividades investigadas:

> Tales actividades podrían ser en celebración, protesta y apoyo a particulares, causas políticas, como protestas contra la Marina de Estados Unidos, contra la presencia de la Corte Federal, contra el servicio militar obligatorio, contra el arresto de estudiantes universitarios, contra la contaminación ambiental, contra la proliferación de bombas nucleares, contra la comparecencia del Gobernador ante las Cámaras Legislativas, contra la represión gubernamental en sus varias modalidades, contra la permanencia del estado colonial, contra medidas adoptadas por las autoridades universitarias, escuelas y otros centros de enseñanza, y otras causas. También podrán ser actividades en apoyo de huelgas, mayormente del sector gubernamental; en apoyo de los músicos puertorriqueños, en apoyo de personas arrestadas; o, meramente por la presencia como abogados o como observadores en vistas ante los tribunales, tanto estatales como el federal, relacionadas con casos de abogados separatistas o con otras personas u organizaciones de las calificadas precedentemente. *Todo lo anterior reviste la mayor gravedad, cuando consideramos que, por propia admisión del Estado, toda*

*la información que aparece en los archivos de la Policía y del Negociado de Investigaciones Especiales del Departamento de Justicia, que actualmente está bajo custodia judicial, es de naturaleza ideológica, sin que envuelva conducta delictiva alguna.* (Énfasis suplido.) Caso Núm. CE-89-578, Parte I, *Exhibit* I, pág. 31.

Resulta ser particularmente alarmante el hecho de que al efectuar estas investigaciones el Estado conocía que los métodos descritos anteriormente violaban los derechos constitucionales de los investigados y que, por esa razón, había que utilizar las técnicas investigativas de forma tal que se evadiera la responsabilidad civil y criminal que las actuaciones inconstitucionales del Gobierno podrían precipitar. Esto se desprende de un documento encontrado por los Comisionados en los archivos de la División de Inteligencia de la Policía que contiene unas guías sobre el proceso investigativo que origina el caso de autos:

Cuando se nos asigna una investigación tenemos que hacer uso de nuestra habilidad para poder realizarla. Tenemos que tomar en cuenta que a estas investigaciones no se aplican las técnicas de investigación criminal.

Nosotros tenemos que investigar de tal manera que las personas entrevistadas ni la persona investigada se enteren de nuestra labor. En otras palabras, las personas que se entrevisten no pueden saber a quién es que se investiga, por qué se investiga, qué es lo que se investiga, ni quién es el que investiga (No pueden saber que usted es un agente de la Oficina de Inteligencia).

Si nosotros fallamos en esa labor nos exponemos a que radiquen una querella en contra nuestra por violación de derechos civiles y a ser procesados criminalmente. Esto es así, ya que nuestras investigaciones giran en torno a individuos que profesan ideales separatistas y estos al saber que los estamos investigando alegan que los estamos persiguiendo y reprimiendo por sus ideales políticos y como todos sabemos, esto está prohibido por nuestra Constitución.

Para prevenir ese problema es necesario que adoptemos nuestro propio sistema de investigación, valiéndonos de ciertas artimañas para hacer creer a las personas que entrevistamos que estamos investigando otros asuntos que no tienen nada que

ver con subversión o afiliaciones políticas. (Citado en el *Informe de los Comisionados*, pág. 11.) Caso Núm. CE-89-578, Parte I, *Exhibit* I, págs. 39–40.

En fin, el examen que hemos hecho de estos expedientes nos convence de que hay que erradicar para siempre esta técnica investigativa que durante los años de la Guerra Fría se convirtió en un poderoso instrumento del Estado para reprimir e intimidar a ciudadanos que discrepaban de la ideología prevaleciente y para intervenir directamente en el proceso político socavando la credibilidad del liderato político y creando las condiciones para trastornar actividades legítimas.

Todos los que nacimos al final de la Segunda Guerra Mundial nos criamos durante la Guerra de Corea, asistimos a la universidad durante la Guerra de Vietnam y el movimiento de los derechos civiles en Estados Unidos; y ahora, presenciamos el desmembramiento de la Unión Soviética y el derrumbe de la muralla de Berlín, y pertenecemos a una generación que valoriza la importancia de los derechos humanos en nuestro ordenamiento democrático.

En momentos en que desde Alemania Oriental hasta Chile las fuerzas democráticas han abolido estas técnicas investigativas, corresponde a nuestra generación eliminar para siempre "las listas", fichas y tarjeteros preparados por la agencia del Estado y prohibir tajantemente estas prácticas.[6] También, al amparo del derecho constitucional de acceso de información reconocido en *Soto v. Srio. de Jus-*

---

[6] En su informe, la Comisión de Derechos Civiles señala que "[p]ara asegurarnos que no se repita esta indeseable práctica se hace necesario fortalecer su proscripción con la sanción penal a imponérsele a toda persona que investigue, persiga, prepare fichas, tarjetas, o expedientes de vigilancia sobre cualquier ciudadano por razón de su ideología política, social, o religiosa y a cualquier persona, organización, agencia o entidad que utilice la información contenida en los expedientes, carpetas, listas o ficheros". Informe de la Comisión de Derechos Civiles, Discrimen y Persecución por Razones Políticas: La Práctica Gubernamental de Mantener Listas, Ficheros y Expedientes de Ciudadanos por Razón de Ideología Política de 1ro de febrero de 1989, pág. 377. Corresponde a la Asamblea Legislativa tomar la acción correspondiente para proscribir penalmente estas violaciones constitucionales.

*ticia*, 112 D.P.R. 477 (1982), estamos obligados a devolver-les íntegramente las carpetas a todos los afectados y a establecer los mecanismos de rigor para reparar los agravios causados por esta práctica inconstitucional y antidemocrática:

> Es responsabilidad de todos llevar hasta sus últimas consecuencias jurídicas y políticas la decisión de terminar con el discrimen y la persecución política. Debemos asegurarnos de que se tomen las medidas apropiadas para que desaparezca para siempre de nuestra vida de pueblo el discrimen y la persecución política de las cuales la confección de listas es sólo una manifestación. Informe, *supra*, pág. 375.

— O —

Opinión particular de conformidad emitida por el Juez Asociado Señor Fuster Berlingeri.

Estrictamente hablando, el asunto ante nuestra consideración en este caso se limita a decidir si debe eliminarse de los documentos en controversia determinada información, supuestamente confidencial, que aparece en ellos, antes de entregar esos documentos a las personas afectadas. No está de modo alguno, ante nos, la cuestión de si los expedientes deben entregarse a las personas afectadas. Eso lo resolvió ya, de manera definitiva, este Tribunal en su decisión de 21 de noviembre de 1988, como parte del unánime repudio expresado entonces a la odiosa e inconstitucional práctica de determinados funcionarios públicos de levantar expedientes sobre personas, exclusivamente por razón de sus creencias políticas.

Es importante recalcar que no está en cuestión la entrega de los expedientes porque, a la luz del informe de los Comisionados nombrados para entender en este asunto, el planteamiento del Estado sobre la eliminación de la información supuestamente confidencial que aparece en ellos, se convierte en la práctica en un reclamo de no entregar los

expedientes. Los Comisionados, luego de un estudio a fondo del asunto, nos dicen que es prácticamente imposible depurar los expedientes como pide el Estado. Para realizar esa labor en un período de tiempo razonable se necesitarían enormes cantidades de fondos públicos que, evidentemente, no están disponibles. Para realizarla con los recursos ordinarios que podrían estar disponibles, la tarea tardaría tantos y tantos años que el asunto se convertiría en una verdadera burla. En efecto, pues, la disyuntiva real ante nos es sencilla: si ordenamos expurgar los expedientes, denegamos en la práctica su entrega. En cambio, si se va a honrar la decisión anterior de este Tribunal de que sin la entrega de los expedientes "se deja trunca ... la declaración de inconstitucionalidad de la práctica ... ilegal" —*Noriega v. Gobernador*, 122 D.P.R. 650, 688 (1988)— entonces hay que denegar la depuración que pide el Estado.

Ante esta disyuntiva, la posición que debe asumir este Tribunal es inexorable: los expedientes deben entregarse expeditamente. Aun si fuesen enteramente válidos los reclamos de confidencialidad del Estado, tiene que prevalecer la alternativa que ya este Tribunal ha adjudicado como necesaria para vindicar los derechos constitucionales de las miles de personas afectadas. "Sólo así se podrá cerrar un capítulo, ciertamente no el más preclaro, de nuestra historia colectiva." *Noriega v. Gobernador*, 122 D.P.R. 650, 691 (1988).

## II

Lo anterior no obstante, me parece menester señalar que la atención adecuada y completa de todo este asunto rebasa los límites de la intervención judicial. Lo que tenemos ante nos no es solamente una inusitada y complicada situación de violación de los derechos constitucionales de miles de personas. Se trata más bien de una oscura experiencia en nuestro devenir como pueblo que lamentable-

mente tiene raíces muy hondas y que por ello no puede encararse exclusivamente a través del proceso judicial.

La desgraciada práctica de fichar a miles de personas únicamente por motivo de sus creencias políticas minoritarias fue realizada por funcionarios públicos *durante varias décadas*. La llevaron a cabo por muchos años *distintos Gobiernos* que vinieron al poder en virtud de la victoria política de *distintos partidos*. No puede decirse que fue una práctica privativa de sólo una administración gubernamental que tenía miras particularmente reaccionarias. Más bien, se llevó a cabo durante el tutelaje de Gobiernos tanto liberales como conservadores. No ha sido un incidente aislado susceptible de eficaz reparación por medio de la adjudicación.

Lo que es peor aún, cabe la sospecha de que toda esta odiosa experiencia ha tenido por mucho tiempo el silente apoyo de amplios sectores de nuestra comunidad. Hace tres (3) décadas, en su singular estudio *Los derechos civiles en la cultura puertorriqueña*, Río Piedras, Ed. U.P.R., 1963, el Dr. Edwin Seda Bonilla sacó a la luz pública el alarmante estado de ignorancia sobre los derechos civiles que existía entonces en una gran parte de nuestra población. El autor presentó copiosa evidencia empírica, además, sobre la *enorme intolerancia* que caracterizaba a importantes sectores de nuestra gente en lo que respecta a los derechos y a las creencias de los grupos minoritarios. Según Seda Bonilla, sólo *una tercera parte de nuestra población* concebía como legítimo el derecho de los nacionalistas o de los comunistas a expresarse libremente. Más de la mitad de la población les negaría ese derecho y un 11% de la población, incluso, llegaría al extremo de obligarlos al silencio por la fuerza. Lo que es peor, 41% favorecía que se les expulsara de sus empleos por razón de sus creencias. Bonilla Seda, *op. cit.*, pág. 36. En su erudita interpretación de los hallazgos de su estudio de campo, Seda Bonilla caracterizó esa intolerancia como uno de los rasgos inheren-

tes del *autoritarismo* que según el autor lastraba no sólo a nuestra joven democracia, sino más fundamentalmente a nuestra propia cultura popular. Seda Bonilla lo explica así:

Pero el problema más grave no es el de la simple ignorancia, sino el hecho de que amplios sectores de nuestra población alberguen convicciones y adopten actitudes incompatibles con un tipo de convivencia genuinamente democrática, como son el encontrarse dispuestos a impedir la libre discusión de puntos de vista que no coincidan con los que ellos sostienen; ... *el que porciones aún mayores de la población vean con buenos ojos que tales personas sean arrestadas por la policía, por cometer el supuesto delito de expresar sus opiniones públicamente...*. Para grandes sectores de nuestra población, *la palabra libertad se ha convertido en símbolo peyorativo, asociado con actos de criminalidad, desorden, violencia, inseguridad física y perversión moral...* La libertad constituye una grave amenaza al equilibrio rígido y precario del carácter autoritarista". Seda Bonilla, *op. cit.*, págs. 102–103 y 45.

No hay que ser un eminente sociólogo para saber que ese autoritarismo ha seguido latente en mayor o menor grado, aun en épocas recientes. Hoy todavía nuestra vida democrática no se distingue por el pleno respeto a las ideas o creencias de los que no piensan igual que la mayoría. Todavía persiste el riesgo de persecución o trato discriminatorio por razón de las ideas políticas. Por eso es que creo que el asunto ante nos rebasa las posibilidades del proceso judicial, si es que han de lograrse remedios verdaderamente efectivos.

Las ramas políticas del Gobierno no deben descansar únicamente en lo que hoy aquí disponemos. Cuando menos, deben encarar abiertamente este asunto y explorar medios no sólo para vindicar de modo más satisfactorio los derechos de las partes afectadas sino, además, para asegurar que tal práctica no pueda volver a ocurrir, aprovechando la ocasión para buscar nuevas maneras de enriquecer nuestro acervo democrático. Entre las medidas que el Gobernador y la Asamblea Legislativa deben considerar está la de una gran disculpa pública oficial de parte del

Estado, efectuada con la mayor lucidez y solemnidad, de profundo contenido educativo, que a lo largo y a lo ancho de la isla y ante el mundo reconozca el agravio cometido, que ayude a elevar nuestro entendimiento colectivo sobre los derechos de las minorías y que abra el camino para la reconciliación con aquellos cuyos derechos han sido conculcados.